IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

                                                                 Crim. No. 15-4512 MV

v.

JASON DURAN,

      Defendant.

## **MEMORANDUM OPINION AND ORDER**

This matter is before the Court on defendant Jason Duran's Motion to Suppress Statement and Evidence [Doc. 293] and Motion to Suppress Evidence Based Upon Unlawful Tracking and Electronic Communication Interception. [Doc. 305]. The United States of America ("Government") opposes both motions. The Court conducted a hearing on the two motions on May 31 and June 1, 2017.

For the reasons set forth below, both motions are denied.

## I. Background

This case involves a drug trafficking operation in Taos County. The Government contends that beginning at a date unknown and continuing until December 18, 2015, brothers Ivan Romero and Ricco Romero ran a drug distribution enterprise that employed a network of dealers peddling heroin and other controlled drugs. Informants reported to law enforcement agents that Mr. Duran was procuring heroin from suppliers in Albuquerque and delivering one to two pounds of it to Ivan Romero approximately twice a month.

On April 2, 2015, agents obtained a warrant from a New Mexico state court district judge to search Ivan Romero's residence in Taos County. Officers and agents of the Region III Narcotics Task Force, Taos County Sheriff's Department, the New Mexico State Police and the U.S. Department of Justice's Drug Enforcement Agency ("DEA") executed the warrant that evening, and seized marijuana; drug trafficking instruments, supplies and paraphernalia; $64,920 in cash; 305.2 grams of heroin; and cell phones.

Subsequently, numerous text messages between Ivan Romero and Mr. Duran were recovered from the cell phones. According to the government, although the text messages were in veiled or coded language, they corroborated witnesses' reports of Mr. Duran's role in the organization, specifically, that he repeatedly procured heroin, and occasionally methamphetamine, from suppliers around Albuquerque, transported the drugs (as well as bags of dog food) to Ivan Romero in Taos, collected cash from Ivan Romero and delivered the cash to the suppliers. Ivan was arrested and charged in state court in Taos County with drug trafficking offenses, and his bond was set at $90,000. He bonded out the next day after other members of the Romero family visited a Taos bank and exchanged $90,000 in U.S. currency for a bank check used to post his bond.

On June 29, 2015, agents executed a federal search warrant at the home of Wilma Romero (Ivan's and Ricco's mother) in Arroyo Hondo and seized drug packaging materials and digital scales, marijuana, ammunition, $73,288 in U.S. currency, gold ingots and coins and 97.5 grams of heroin.

Subsequently, investigators identified Mr. Duran's source of supply in Albuquerque and conducted surveillance of Mr. Duran and the supplier. To facilitate the surveillance, on September 28, 2015, they applied for and obtained federal tracking warrants authorizing the

installation of tracking devices on Mr. Duran's Ford Mustang and Ford pickup.

## October 13, 2015 Stop

According to the government, on the evening of October 13, 2015, Mr. Duran drove his Ford pickup to the residence of his heroin supplier in Albuquerque.[1] After parking his truck, he got out of the vehicle and entered the residence. A few minutes later, he emerged from the residence, got back into the truck and drove to his own residence in Albuquerque. Later that evening, Mr. Duran left his residence in his Ford Mustang and headed north on I-25. DEA agents alerted New Mexico State Police Officer Ronald Wood that Mr. Duran was believed to be transporting heroin to the Romero organization in Taos.

At approximately 10:14 p.m., Officer Wood observed Mr. Duran's Ford Mustang traveling north on I-25 at a rate seven miles over the speed limit. Officer Wood stopped the car at milepost 257 in Sandoval County. Pamela Valdez, Duran's girlfriend, was driving. She told the officer she did not have a driver's license. She said she and Mr. Duran were going to Taos to go pinon picking. Mr. Duran also said he was going to Taos to go elk hunting. The officer issued Valdez a citation for driving without a license and a written warning for the speeding violation.

After issuing the citation, the officer told Valdez she was free to go and then inquired whether he could ask her additional questions. She agreed, as did Mr. Duran. Officer Wood questioned the two about why they did not have luggage. Valdez said she did not know how long they were going to stay in Taos and Mr. Duran said he had everything he needed at his house in Taos. The officer, who had participated in the investigation of the Romero drug trafficking

---

[1] DEA Agent Kevin Mondragon testified a pole surveillance camera that had been installed at Gloria Duran's residence showed Mr. Duran arriving at Gloria Duran's residence and parking at the curb. [6/1/2017TR at 11].

3

operation, suspected Mr. Duran was transporting heroin to Taos. Mr. Duran and Valdez refused the officer's request to consent to a search of the vehicle, but he advised them of his suspicions and told them he was going to walk his drug detection dog around the exterior of the vehicle. The dog conducted a free air sniff of the exterior of the car and alerted to the scent of a controlled substance. Officer Wood then searched the vehicle and found several packages of suspected heroin with an aggregate gross weight of 131 grams. An additional 10.6 grams of suspected heroin was found in a purse.

Mr. Duran and Valdez were detained and given *Miranda* warnings. Mr. Duran initialed and signed an Advice of Rights form acknowledging he understood his rights and waived them, electing to speak with law enforcement agents. However, expressing concern that his statements might be disclosed to co-conspirators, he declined to be recorded while speaking with investigators, and executed a written Recording Declination.

During his interview, Mr. Duran told agents that Ricco Romero had asked him to transport the heroin found in his car to Taos. He said that Ricco had told him to pick up a discarded McDonalds bag containing the heroin from the side of the road in southwest Albuquerque and to transport it to Ricco in Taos as a test run; if Ricco approved of the quality of the heroin, Mr. Duran would transport kilogram quantities of heroin to Ricco in the future. Mr. Duran provided agents with telephone numbers for Ricco and Ivan Romero, and told them he knew law enforcement agents had seized $90,000 from a safe that Ricco kept at his mother's home and that he also stored money and rugs in a safe in his home and a safe at the home of a man Mr. Duran only knew as "Ricky." He offered to cooperate with law enforcement, and said he would be willing to make a controlled delivery for agents and would remain in contact and provide information regarding any new developments.

The government avers that although many of Mr. Duran's statements were "laden with half-truths, omissions and outright falsehoods," the investigators let him go to avoid compromising the ongoing investigation. [Doc. 310-1 at 8].

### October 17, 2015 Stop

The government alleges Mr. Duran, without informing agents of his trip, made another delivery to the Romeros on October 17, 2015. According to tracking data, he drove north to Bernalillo (apparently to pick up bags of dog food from a vendor), then doubled back and took back roads east of Albuquerque north to Santa Fe. DEA agents alerted New Mexico State Police to Mr. Duran's travel. State Police Officer Nathan Lucero stopped Mr. Duran north of Espanola. Although a drug detection dog alerted to the presence of a controlled substance, the officers were unable to locate those drugs and released Mr. Duran, who continued to Taos. Subsequently, a cooperating witness or informant told agents that Mr. Duran had been stopped by police while transporting heroin to Ricco Romero, but the police had failed to find the heroin, which Mr. Duran thereafter delivered to Ricco.

### October 21, 2015 Meeting

After the October 17 stop, DEA Agent Kevin Mondragan contacted Mr. Duran by telephone and asked to meet with him. Mr. Duran met with agents Mondragon and William Fresquez at a Hooter's parking lot in Albuquerque on October 21, 2015. The agents told Mr. Duran they knew he had not been truthful with them. According to the agents, Mr. Duran confessed he had not been completely forthright, and provided a more complete account of the conspiracy. Among other things, he told the agents:

- He had been involved in the Romero drug trafficking operation for about three years. Initially, he drove Elias Romero (father of Ivan and Ricco) to Albuquerque about once every week or week-and-a-half to purchase heroin from the group's primary supplier.

5

After Elias died in 2016, Ivan Romero asked Mr. Duran to take on the responsibility of dealing with suppliers and transporting heroin to Taos.

- Mr. Duran had picked up packages of heroin from the primary supplier approximately 30 times. The size of the packages increased over time. He estimated the larger packages each contained two pounds of heroin.

- After the primary supplier was arrested and jailed on state charges, the supplier's wife agreed to supply the Romero operation. Mr. Duran said that he had picked up packages from the wife approximately 40-50 times. He picked up packages and transported them to Taos at least twice a month.

- Mr. Duran said he usually picked up bundles of money from Ivan and delivered them to the primary supplier or his wife. He helped Ivan count the money to be paid to the supplier on several occasions, and he estimated that he transported approximately $35,000 per month to the heroin suppliers.

- Mr. Duran admitted he had obtained the heroin seized from his car on October 13, 2015, from the wife of his primary supplier.[2]

During the October 21, 2015 meeting, Mr. Duran renewed his promise to cooperate. Subsequently, he met with Ricco Romero and, at the request of the DEA agents, wore an audio recording device, which recorded his conversation with Ricco.

## II. Mr. Duran's Motion to Suppress Statements and Evidence [293]

Mr. Duran, arguing he was coerced, seeks to suppress statements he made during the three encounters described above.

When a confession is challenged as involuntary, the prosecution must prove by at least a preponderance of the evidence that the confession was voluntary. *Lego v. Twomey*, 404 U.S. 477, 489 (1972). The voluntariness of a confession is a question of fact to be determined by the "totality of circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). Factors that may be considered include the accused's lack of education, his low intelligence, the lack of any advice to the accused of his constitutional rights, the length of detention, the repeated

---

[2] *See* Report of Investigation, DEA Form 6, signed by. Agent Mondragon. [Govt. Ex. 9].

and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep. *Id.*

The Tenth Circuit has held that "[w]hether a defendant's incriminating statements were voluntarily made must be assessed from the totality of the circumstances, looking both at the characteristics of the defendant and the details of the interrogation. The essence of voluntariness is whether the government obtained the statements by physical or psychological coercion such that the defendant's will was overborne." *United States v. Rith*, 164 F.3d 1323, 133 (10th Cir. 1999).

However, "coercive police activity is a *necessary predicate* to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Colorado v. Connelly*, 479 U.S. 157, 167 (1986) (emphasis added). Thus, "personal characteristics of the defendant are constitutionally irrelevant absent proof of coercion." *United States v. Erving L.*, 147 F.3d 1240, 1249 (10th Cir. 1998). "[C]oercion need not depend upon actual violence by a government agent; a credible threat is sufficient." *United States v. McCullah*, 76 F.3d 1087, 1101 (10th Cir. 1996). Coercion may also include situations where "the police . . . somehow overreach by exploiting a weakness or condition known to exist." *United States v. Robertson*, 19 F.3d 1318, 1321 (10th Cir. 1994).

### October 13-14, 2015 Interview

Mr. Duran raises three issues concerning the October 13, 2015 interview. First, he faults the government for failing to record the interview. Second, he contends he was not properly Mirandized. Third, he argues his statements during the October 13, 2015 interview were coerced and/or made in acquiescence to strongly leading questions by the DEA agents.

7

The Court finds no merit in Mr. Duran's argument concerning failure to record. Mr. Duran acknowledged he signed a DEA form declining to have his interview audio or video recorded, and he testified at the hearing that he told DEA Task Force Detective Adam Gaitan he did not want his statement recorded because he didn't want anyone to find out about it. [6/1/17 Hearing Transcript ("TR") at 133].[3] Nor does the Court credit Mr. Duran's criticism that Detective Gaitan should have read him his *Miranda* rights before asking permission to record the interview. Detective Gaitan explained that it is his practice to ask for permission to record before advising suspects of their *Miranda* rights, so that if permission is given, he can record the advisement of the *Miranda* rights and the election of waiver. [5/31/17 TR at 104-105] Moreover, Mr. Duran presented no evidence he was pressured to decline recording.

Mr. Duran also contends he was not properly Mirandized because, although he can read, he has a learning disability that limits his reading comprehension ability. However, it is undisputed that Officer Gaitan actually read Mr. Duran both the declination form and the *Miranda* rights warning before the Mr. Duran made any self-incriminating statements. [5/31/17 TR at 77-78, 105].

Additionally, Mr. Duran testified that although he had signed a waiver of rights, he felt he did not have a choice because he was intimidated by the tone of the officers' voices. [6/1/17 TR at 125]. This evidence is insufficient to establish coercion. Mr. Duran identifies no "credible threats" of coercion, much less actual physical coercion. *See McCullah*, *supra.* To the contrary, Detective Gaitan testified that during the interrogation, he was cordial and polite to Mr. Duran; he did not draw his weapon, threaten, brow-beat or try to intimidate Mr. Duran in any way.

---

[3] Citations to the Hearing Transcript refer to a rough draft of the transcript from the May 31-June 1, 2017, hearing prepared for the Court by its court reporter. Quotations and citations, therefore, should not be understood to be precise, verbatim accounts, but rather sufficiently close approximations that suffice for the purposes of this Memorandum Opinion and Order.

8

[5/31/17 TR at 103]. Nor is there evidence that the agents overreached by exploiting a weakness or condition on Mr. Duran's part. Detective Gaitan testified that Mr. Duran never indicated at all that night that he was having trouble understanding what he was telling him. *Id.* at 104.

Finally, Mr. Duran contends that statements he made during the interview were mere acquiescence to strongly-leading questions of the DEA agents—in other words, the officers were putting words in his mouth. The Court disagrees. Mr. Duran admitted on the witness stand that he made the following false statements during the October 13-14 interview and the October 17 stop: (1) During the October 13-14 interview, he told Detectives Gaitan and Fresquez that Ricco Romero had instructed him to pick up heroin that would be in a discarded McDonalds bag on the side of the road; and (2) during the October 17 stop, he told Officer Lucero that he had gone from Albuquerque to Santa Fe on I-25. [6/1/17 TR at 132-133, 135].[4] Moreover, while he told Detective Gaitan during the October 13-14 interview that the drug pick-up from Gloria Duran was a test run, agents knew Mr. Duran had already previously delivered heroin to Ivan and Ricco Romero. [5/31/17 TR at 132].

These falsehoods undermine Mr. Duran's contention that he merely acquiesced to agents' leading questions. Additionally, during the October 17, 2015 stop, Mr. Duran told Officer Lucero that he was working with the DEA to build a case against "Ivan," and that Agent Mondragon knew he was traveling to Taos that day. [6/1/17 TR. at 66-68]. These statements support the government's assertion that after his October 13 arrest, Mr. Duran feigned cooperation, attempted to mislead the agents and continued to participate in the conspiracy.

---

[4] The government also contends Mr. Duran lied when he told Officers Gaitan and Fresquez that he was taking heroin to Ricco Romeo as a "trial run" and when he told Officer Lucero that he had informed Agent Mondragon about his October 17 trip to Taos. During the hearing, Mr. Duran denied these statements were untrue. [6/1/17 TR at 132-133, 136-137].

Therefore, the Court rejects Mr. Duran's argument that his statements to law enforcement on October 13-14, 2015, were coerced.

### B. October 17, 2015 Stop

Mr. Duran asserts that Officer Lucero made threats against him during the October 17, 2015 stop. The videotape of the stop confirms that at one point Officer Lucero told Mr. Duran if he had to arrest/detain him, the three dogs he had in the car could be taken by Animal Control, and that "you can help yourself out in this situation." However, since Mr. Duran was not detained or arrested, this stop appears to be irrelevant to the motion to suppress. Additionally, as noted above, Mr. Duran volunteered information that he was cooperating with the DEA and the DEA agent knew he was traveling to Taos that day. [6/1/17 TR at 135].[5] Moreover, as Mr. Duran admitted during the hearing, he lied to Officer Lucero when he told him he had traveled from Albuquerque to Santa Fe on I-25. *Id.* This conduct undermines his claims of coercion. Accordingly, even if the stop is relevant to the suppression motion, the Court concludes Mr. Duran's assertion that he was coerced lacks support.

### C. October 21, 2015 Meeting

Mr. Duran argues that the October 21, 2015, meeting with Agent Mondragon is inadmissible based on coercion. Specifically, he complains that the agent made multiple calls to him in a very short period of time, demanded that he meet with him immediately at a location the agent chose, parked near a Hooter's restaurant on San Mateo Avenue, watched him arrive, and—after telling Mr. Duran to look for him in a black Lincoln Town Car—drove up in a white Escalade. He asserts the interaction is inadmissible in its entirety, as is his subsequent

---

[5] Mr. Duran also testified at the hearing that he had told Agent Mondragon he was traveling to Taos on October 17, 2015. [6/1/17 TR at 136].

interaction with Ricco Romero, during which Mr. Duran was wearing a wire.[6]

The government, though, contends that since Mr. Duran was not arrested or restrained on October 21, but instead drove to the meeting of his own accord, the noncustodial meeting did not trigger any requirement for *Miranda* warnings or recording. Mr. Duran concedes he was not in custody at the time of the meeting, but asserts his statements were nonetheless coerced.

"Even if a defendant is not subject to custodial interrogation—and therefore not entitled to *Miranda* warnings—his incriminating statements, if involuntarily produced, are inadmissible." *United States v. Cash*, 733 F.3d 1264, 1280 (citing *Arizona v. Fulminante*, 499 U.S. 279 at 287-88 (1991)). Further, "[t]he voluntariness of a statement depends upon an assessment of 'the totality of all the surrounding circumstances' including 'both the characteristics of the accused and the details of the interrogation." *Id.* (citing *United States v. Chalan*, 812 F.2d 1802, 1307 (10th Cir. 1987) (internal citation omitted)).

Applying the totality of circumstances analysis, the Court must consider "(1) the age, intelligence, and education of the defendant; (2) the length of detention; (3) the length and nature of questioning; (4) whether the defendant was advised of his constitutional rights; and (5) whether the defendant was subject to any physical punishment." *Id.* (citations omitted).

Mr. Duran testified that, with respect to the October 21, 2015, meeting, he felt he had no choice because he was intimidated by the tone of the officers' voices. [6/1/17Tr. at 125]. However, as with the earlier custodial interview, Mr. Duran has presented no evidence of even a threat of coercion, much less any actual physical coercion.

Mr. Duran can read and write, as evidenced by text messages between him and the Romero brothers. As previously noted, although he characterizes himself as having only

---

[6] The government announced during the hearing that it did not intend to present evidence of the subsequent meeting during the trial. [5/31/17 TR at 164-165].]

acquiesced to strongly leading questions by the agents, the record clearly establishes that in previous encounters he had lied and attempted to mislead law enforcement. Further, there is no evidence he was forced to meet with Agent Mondragon. Rather, Mr. Duran testified that Agent Mondragon called him at home and "told me I had to be there, so, yes of course. I was taught to God fearing loving family to treat people with respect and honor." [6/1/17 TR at 143]. Mr. Duran then voluntarily drove to a public parking lot at a shopping center to meet with Agents Mondragon and Fresquez, exited his vehicle and got in their vehicle. When he got into Agent Mondragon's vehicle, neither agent drew their weapons, nor was Mr. Duran placed in handcuffs. [5/31/17 TR at 141]. Neither agent shouted at him, abused him or attempted to coerce him. *Id.* As with the October 13-14 interrogation, there is no evidence that the agents threatened Mr. Duran with violence. Nor is there any evidence that the agents exploited any weakness or characteristic of Mr. Duran. Agent Mondragon testified that Mr. Duran initially wouldn't say anything, but after he was told he had been observed going to the source's house, and agents had just executed a search warrant at the house, he was more open. [5/31/17 TR at 141-142].[7] According to the Report of Investigation, Mr. Duran discussed his involvement in the Ivan Romero drug trafficking operation in some detail, and reiterated his willingness to cooperate with law enforcement. [Govt. Ex. 9]. Mr. Duran gave the agents information about the drug conspiracy and his participation in it that was consistent with other information in the case. [5/31/17TR at 145]. Subsequently, he secretly recorded a meeting with Ricco Romero that corroborated much of the information he provided in the October 21 meeting. *Id.* at 145-146.

Having considered the totality of the circumstances, the Court rejects Mr. Duran's contention that his statements to the DEA agents during the October 21, 2015, meeting were

---

[7] Agent Mondragon testified that on October 21, 2015, agents executed a search warrant at the residence of Gloria Duran, Mr. Duran's source. [5/31/1017TR at 139].

12

coerced.

### III. Mr. Duran's Motion to Suppress Evidence Based Upon Unlawful Tracking and Electronic Communication Interception [305]

Mr. Duran has moved to suppress all evidence obtained as what he characterizes as "fruit of the unlawful tracking and unlawful interception of electronic communication," which he contends was conducted in violation of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, as amended, 18 U.S.C. § 2510-22, and of the Fourth Amendment. [Doc. 305 at 1]. He asserts that he was under some form of electronic surveillance by the Government, and speculates that agents used "the notorious Stingray (or equivalent) device" to track him. *Id.* at 1, 8.

Agent Mondragon testified that, during the April 2, 2015, raid on Ivan Romero's house, law enforcement seized several cell phones. [5/31/17 TR at 111]. The phones contained texts between Ivan and Mr. Duran with coded language Agent Mondragon testified were discussions about buying drugs. *Id.* at 116-117.

On September 28, 2015, the government filed applications for tracking warrants for Mr. Duran's 2002 Ford pickup and his 2002 Ford Mustang. [Ex. 1(A), Ex. 2(A)]. The applications were supported by identical 27-page affidavits signed by Agent Mondragon. *Id.* Magistrate Judge Steven C. Yarbrough issued the tracking warrants the same day, authorizing installation and use of tracking devices without the approval or knowledge of the owner. *Id.* The warrants permitted agents to enter the vehicles and/or private property for purposes of installing, maintaining or removing the tracking devices. *Id.* The devices were to be installed by October 7, 2015, and their use was authorized for 45 days. *Id.* The Magistrate Judge added the following hand written statement to each warrant:

> This warrant prohibits the seizure of any tangible property. To the extent the information authorized to be seized constitutes wire or electronic communication, reasonable necessity exists for its seizure.

*Id.* Agent Mondragon did not request this addition, either in his application or during his meeting with the Magistrate Judge. [5/31/17 TR at 173-175].

Agent Mondragon testified he placed the tracking devices, which attach magnetically to the exterior of the vehicle,[8] on Mr. Duran's 2002 Ford pickup truck and 2002 Ford Mustang on October 1, 2015. [5/31/16 TR at 121-122]. The agent testified that, once installed, the tracker provides global positioning information on the vehicle. *Id.* at 123. The tracker does not, however, intercept any communications. *Id.* at 126.

On October 13, 2015, the tracking data showed that the 2002 Ford pickup went to the home of Gloria Duran, the drug conspiracy's supplier in Albuquerque. [5/31/15 TR at 126-127; Govt. Ex. 4]. It was there no more than five minutes and, afterward, it returned to Mr. Duran's residence on Espanola Street. [5/31/15 TR at 127]. Agent Mondragon believed, based on information obtained during the investigation, that Mr. Duran would be traveling to Taos to deliver the heroin. *Id.* at 127-128. At that point, he decided to try to conduct a stop. *Id.* at 128. He contacted Officer Wood and advised him that Mr. Duran had visited the drug supplier's house, and that he believed he would be traveling to Taos. *Id.* at 128-129. Subsequently, Agent Mondragon saw from tracker data that the 2002 Ford Mustang had started moving, and he called Officer Wood again to notify him the vehicle was headed north on I-25. *Id.* at 129. Officer Wood pursued and caught up with the vehicle. *Id.* at 129-130. A review of the DVD of the tracking data [Def. Ex. G], as well as the printout of the data [Govt. Ex. 3], confirms that the Ford Mustang actually left Mr. Duran's residence on the evening of October 13, 2015, traveled

---
[8] These types of tracking devices are known as "slap-on" trackers. [5/31/17 TR at 171].

14

north on I-25, and was stopped near mile marker 257.[9]

A Return of Tracking Warrant for each warrant was completed and signed by Agent Mondragon on January 8, 2016. *Id.* In the section titled "Return of Tracking Warrant With Installation," under "1. Date and time tracking device installed:" the agent hand-wrote, "N-A." *Id.* Under the Section titled "Return of Tracking Warrant Without Installation," the agent indicated that both warrants were executed on October 1, 2015 at 2 a.m., and tracking information was obtained from October 1, 2015 to December 18, 2015. *Id.*

In his Motion to Suppress, Mr. Duran asserted that evidence obtained as a result of the tracking warrants should be suppressed because:

A. The government's applications and affidavits did not identify the nature/type of tracking devices to be utilized;

B. Agent Mondragon led the Magistrate Judge to believe a conventional tracking device would be used but actually used a Stingray or another equivalent device (i.e., a "cell site simulator")[10] to track Mr. Duran and intercept his cell phone calls and texts. Since this constitutes wiretapping, the warrant failed to satisfy the requirements of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, as amended, 18 U.S.C. § 2516(1);[11] additionally, the warrant was void *ab initio* under the Act because the magistrate judge did not have authority to issue it; and

---

[9] Inexplicably, the data in both Defendant's Ex. G and Government's Ex. 3 appears to be off by two hours, showing the Ford Mustang left Mr. Duran's house at 23:48 hours (11:48 p.m.), whereas Officer Wood testified he got the call from Agent Mondragon alerting him that Mr. Duran's vehicle was in motion close to 10 p.m. [5/31/17TR at 10 p.m.]. Nonetheless, the data clearly establishes that the Ford Mustang traveled north on I-25 the night of October 13, 2015, and was stopped at Mile Marker 57.

[10] A cell site simulator is an IMSI (International Mobile Subscriber Identity) catcher, i.e., a telephone eavesdropping device used for intercepting mobile phone traffic and tracking movement of mobile phone users. According to Wikipedia, it is "[e]ssentially a 'fake' mobile tower acting between the target mobile phone and the service provider's real towers."

[11] The Act requires, among other things, that a District Court Judge sign the warrant, and that the warrant include a finding that other investigative procedures have failed or reasonably appear to be unlikely to succeed if tried, or an explanation for why the procedures are too dangerous to attempt. *See* 18 U.S.C. §§ 2511, 2518(1)(C).

C. Agents violated the search warrants because they continued to monitor his movements (and to intercept electronic communications) with the devices after the 45-day limit ran and did not stop the tracking (and interceptions) until December 18, 2015, when the Return of Tracking Warrant With Installation forms were filed.

Accordingly, he argues that both the October 13 traffic stop and the October 17 traffic stop, each of which was facilitated by the improper use of a tracking device or cell-site stimulator, were unconstitutional.[12]

**A. Nature/Type of Tracking Devices**

In his affidavit, Agent Mondragon described the tracking devices he proposed to use as equipment that would emit electronic or radio signals permitting law enforcement authorities to track the movement and location of the two vehicles at issue. [Doc. 314-1 at 27; 314-2 at 27]. Additionally, he stated that the devices "may produce signals from inside private garages or other such locations not open to public or visual surveillance," and "[p]eriodic monitoring of the tracking devices would be conducted during both daytime and nighttime hours for a period of 45 days from date of issue." *Id.* This adequately describes the nature and type of tracking device to be used.[13] Thus, the Court rejects Mr. Duran's argument that the warrant applications and affidavits did not specify the type of tracking device the government proposed to use.

---

[12] This allegation appears to be at odds Mr. Duran's assertion, in the same section of his motion, that during the October 17 stop, Officer Lucero was unable to locate any tracking device on the vehicle. [Doc. 305 at 7].

[13] Agent Mondragon testified the trackers installed, known as "slap on" devices, attach magnetically to the exterior of the vehicle. [5/31/17 TR at 122, 171]. Once a tracker is activated, it periodically sends global positioning information (also called "pings") on the vehicle to a database that agents can access on their computers. *Id.* at 122-123. Agents can set the frequency of the "pings." [6/1/17 TR at 75-76]. The government introduced separate printouts of the data on the 2002 Ford pickup truck (Ex. 4) and the 2002 Ford Mustang. (Ex. 3). Agent Mondragon testified that the slap on devices did not intercept any communications. [5/31/17 TR at 126].

The evidence presented during the hearing clearly establishes that tracking devices—and not, as alleged by Mr. Duran, cell site simulators—were used, and that the tracking devices actually functioned in the manner described above. Therefore, the Court rejects this argument.

**B. Use of Cell Site Simulators**

In his motion, Mr. Duran asserted that since the agent marked "N/A" in the "Date and Time Tracking Device Installed" section of the Returns of Warrant, this means no tracking devices were ever installed on either of his vehicles. He contended that instead, agents used a Stingray or another equivalent device to track him and to monitor his cell phone calls and texts. Additionally, he argues the fact that the government has texts between Mr. Duran and other alleged coconspirators proves it was using an illegal wiretap.

However, at the hearing, Mr. Duran presented no evidence that a Stingray or similar device was installed or used on his vehicles. Further, Agent Mondragon's testimony and the tracking data establish, to the contrary, that: (1) "slap on" devices that record only geographic location were installed on the vehicles, and the tracking data contains no intercepted communications; and (2) to the extent the government has text messages to and from Mr. Duran, they were recovered from cell phones seized during the April 2, 2015, search of Ivan Romero's house.[14]

Citing *In re U.S.*, 10 F.3d 931, 938 (2d Cir. 1993), Mr. Duran also argues that the tracking warrants were void *ab initio* because they were improperly issued by the Magistrate

---

[14] Agent Mondragon testified that after the seizure of the cell phones at Ivan Romero's home, he obtained a warrant to search the phones. [5/31/17 TR at 114]. During the search of the phones, he found text messages between Ivan Romero and Mr. Duran. *Id.* at 115. The text messages contained coded language discussing drugs, including references to "shards," which refers to methamphetamine; and "dog food," which in some instances referred to heroin and in other instances to actual dog food. *Id.* at 116-117. The agent found similar code in text messages between Ivan Romero and codefendants Juanita Romero, Nicholas Baca and Tyler Baker, who also distributed heroin for the drug operation. *Id.* at 114-117.

Judge pursuant to the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510-2522 ("the Act").[15]

Under the Act, only Article III judges are permitted to issue warrants for wiretaps. In *In re U.S.*, the government petitioned for mandamus, requesting a determination of the authority of the United States District Court for the Southern District of New York to delegate to federal Magistrate Judges the power to review wiretap applications or seeking an order directing the Article III judges to review such applications personally. The appellate court held district judges did *not* have authority to delegate wiretap applications to Magistrate Judges because Magistrate Judges are not Article III judges, and it ordered the Chief Judge of the Southern District of New York to stop do so. *Id.* at 938

However, the Court is not persuaded by Mr. Duran's argument that the warrants were void *ab initio*. It is undisputed that the government did not seek warrants for wiretaps pursuant to the Act. Rather, it sought warrants to install tracking devices pursuant to Fed. R. Crim. P. 41(c) and 18 U.S.C. § 3103. [Govt. Exs. 1A at 1, 2A at 1]. Mr. Duran proffered no evidence showing a cell site simulator was used. Further, Agent Mondragon testified that slap on devices—and not cell site simulators—were used, and the only data collected was tracking data. [5/31/17TR at 125-126].] Furthermore, in contrast to the Second Circuit case, this Court did not refer to the Magistrate Judge a motion for a wiretap pursuant to the Act, but rather a motion filed pursuant to Fed. R. Crim. P. 41(c) for 18 U.S.C. § 3103. Finally, the Magistrate Judge did not issue a warrant pursuant to the Act. Rather, on its face, the warrant was issued pursuant to Rule 41(c) and 18 U.S.C. § 3103.

---

[15] Mr. Duran's argument is based on the handwritten language the Magistrate Judge added to the warrant, stating, that "[t]o the extent the information authorized to be seized constitutes wire or electronic communication, reasonable necessity exists for its seizure."

It is unclear why the Magistrate Judge added the hand-written language to the warrant.[16] Mr. Duran, however, has cited no authority—and the Court is aware of none—supporting his argument that the warrant is void *ab initio*.

### C. Use of Tracking Devices Beyond the 45-Day Limit

The original Return of Tracking Warrant forms indicated tracking information was gathered from October 1, 2015 until December 18, 2015—well beyond the 45-day limit imposed by the warrant. [Govt. Exs. 1A, 2A, Returns of Tracking Warrant.] Additionally, in the section of the warrants titled "Return of Tracking Warrant With Installation, on the line, "1. Date and time tracking device installed:" Agent Mondragon wrote "N-A." *Id.* The rest of that section was left incomplete, and Agent Mondragon completed the second section, "Return of Tracking Warrant Without Installation. *Id.* The agent testified he completed the form in this manner because he had mistakenly believed "installation" meant that the device was wired in to the vehicle, as opposed to being slapped on magnetically. [5/31/17 TR at 149].

However, on October 18, 2016, the government filed amended Tracking Warrants deleting the "N-A," completing the "Return of Tracking Warrant with Installation" section, and leaving blank the "Return of Tracking Warrant Without Installation" section. The amended returns state that, with respect to both vehicles, tracking devices were installed on October 1, 2015, used from October 1, 2015 to October 22, 2015, and removed on December 18, 2015. [Govt. Exs. 1(A), 1(B)]. During the hearing, Agent Mondragon testified that tracking information for the Ford truck was gathered only from October 1, 2015, until October 22, 2015, and tracking data for the Ford Mustang was gathered only from October 1, 2015, until October

---

[16] Counsel for the government, Mr. Vasquez, stated that the Magistrate Judge includes the language not only on tracking warrants, but on other documents as well because he is adopting language out of the delayed notice provisions of 18 U.S.C. § 3103(b). [5/31/17 TR at 179].]

23, 2015. [5/31/2017 TR at 152-153; Govt. Exs. 1B, 2B, 3 and 4]. Both tracking devices were removed from Mr. Duran's vehicles following his arrest on December 18, 2015. 5/31/217TR at 147-148, 153]

The Court finds, based on the amended tracking warrants, that the government did not exceed the 45-day limit imposed by the warrants. Accordingly, it rejects Mr. Duran's argument that the use of the tracking devices violated the terms of the warrants.

## IV. CONCLUSION

Mr. Duran's Motion to Suppress Statement and Evidence [Doc. 293] and Motion to Suppress Evidence Based Upon Unlawful Tracking and Electronic Communication Interception. [Doc. 305], are denied.

ENTERED this 20th day of June, 2017.

_____
MARTHA VAZQUEZ
United States District Judge